This morning, number 18-1315 Hankins, the Philadelphia Contributorship Insurance Company, et al., Mr. Gibson, Ms. Cooper, and Mr. Semple. This morning, number 18-1315 Hankins, the Philadelphia Contributorship Insurance Company, et al., Mr. Gibson, Ms. Cooper, and Mr. Semple. Thank you, and good morning, Your Honors. My name is Michael Gibson from the law firm of Darcy, Johnson & Day. I'm here on behalf of the appellant and the underlying plaintiff. I'd like to reserve five minutes for rebuttal. Your Honors, respectfully, the court made a series of errors which require reversal here, essentially usurping the role of the fact finder and entering its own judgment of disputed facts. For the most part, the errors that are related to the district are related to the district court's... Your Honors, respectfully, the court made a series of errors which require reversal here, essentially usurping the role of the district court's judgment of disputed facts. For the most part, the errors that are related to the district court's... That's what the wife said he said. I'd have to find the language, but I can do that. Well, we'll get you back on rebuttal, but that's a pretty important point you just made. Well, I will find it for rebuttal, Your Honor, if that's an important distinction for you. The fact that I don't think really matters whether or not you believe the transcript to specifically say get in there and backfill it by hand or just backfill it by hand. It's what they reasonably interpreted his instruction to be. That's the important part. Her reasonable interpretation based on being there, being next to the comments as they were being made, is this is what needed to be done. Not only did it need to be done, but she felt and she represented that it was the mood of the conversation that this needed to be dealt with relatively quickly due to the potential future danger of this foundation. But the errors that were made in the underlying district court decision are really fundamental when you're coming into it from a summary judgment standpoint. Now, the reason for telling him that you need to backfill, I guess is the word, the hole where the root ball was, was to preserve the foundation of the house, if I'm not mistaken. In other words, it wasn't entirely related to the tree itself. It was related to provide protection for the foundation of the house. Of course, there was a very, very significant event that occurred even before he got in there to fill up the hole. Which is the cutting up of the tree? Sure. Well, I agree that it's a significant event. I don't know if it necessarily alters the analysis on what court kinkades foresaw. At the very least, it gives an argument that there's an intervening cause for the tree root ball going back into the space. Of course, I don't disagree that there's an argument there. What I'm saying is these are disputed facts that require resolution by a jury. What is the disputed fact? The disputed fact is, number one, that he anticipated this. I'm sorry, he anticipated? He anticipated that the tree would be cut back after he left. He conceded that during his deposition testimony. He said that it would be reasonable that this would continue to be cut back. Because of that, almost by definition, it cuts the feet or the foundation, for lack of a better phrase, from the superseding cause argument. Because that's got to be something you can't anticipate. That makes sense. At some point, that tree was going to be cut down. Of course. It's in the normal course of the catastrophic cleanup process. Tree comes down. You're saying the adjuster should have told Mr. Hankins? Hankins, yes, Your Honor. That you can go in that hole and cover it up, but be careful because if that tree gets cut, the root ball might flip over and cause you harm. Is that Kincaid's responsibility? Well, my argument is that his first responsibility is to not affirmatively instruct him to engage himself in the process of the claim by getting into that hole. Well, that's why this point about whether the record reflects he was instructed to get in the hole as opposed to backfill the hole by hand. You would agree, right? I agree that that distinction is clear. I also think that it's pretty clear that my client felt that that instruction was, in fact, the reasonable interpretation of what he was saying. You said that there was an instruction by Kincaid to Mr. Hankins that he reported to his wife that the hole should be backfilled by hand by getting down into the hole. I did, Your Honor, yes. If you look at my brief, Your Honor, it should actually be cited on, looks like page 8, but it's deposition pages 199 at, I'm sorry, it's appendix 199 at 99 colon 2 dash 12. And the language is basically this. Would you mind reading it? Of course. I'm sorry about that. This is a question actually by opposing counsel, Ms. Cooper. What exactly, this is to my client. What page is this on? This is on page 7, should be on page 7. We're talking about the appendix. And the appendix, I cite to it at AA199 at 99 colon 2 dash 12 as well as page 73 colon 5 dash 8. So by Ms. Cooper, what exactly did Mr. Kincaid say that led you to believe that there was some urgency about the foundation? Answer. That the foundation had been improvised, that's a misspelling, there's an SIC in there, because the root ball had come up and the dirt had pulled away from the foundation and he had proceeded to show us. Question. And then what did he say? You need to get in there and you need to get in there, in that dirt, and backfill it by hand. Question. And where were you when Mr. Kincaid made that remark? Answer. Go back and read that again. Sure. Which the proceeding. The second part, he said you need to get in. You need to get in there and, and, and, and. Whose deposition? This is Mrs. Hankins? This is Mrs. Hankins' deposition taken by my adversary. Okay. Go beyond, you need to get in there and do what? And you need to backfill it by hand. That should be the exact language. I'm sorry. And you need to get in that hole and backfill it by hand. Did it say hole? It does. Okay. Beyond that, Your Honor. Well, could you, could you discuss then, let's assume all this played out the way that you're suggesting. The fact that cutting the tree was a superseding event. Well, as I was mentioning a moment ago, I don't believe it is a superseding event when you have an anticipation of that event by Kincaid. It's only when the subsequent event is either unrelated or unanticipated, which it can't be when he anticipates it. Now, there's focus on. So he should have anticipated that somebody would come along and sever the tree when Mr. Hankins would be standing in the hole filling. He doesn't have to predict the actual events that ultimately unfold. Only what is within the realm of possibilities. What he did by his own admissions anticipate was that someone would come along and this would continue to be cut back. Who that was is really immaterial. Whether it's a professional or nonprofessional, that doesn't matter. Because what he did by engaging the insured in the claims process, he put him at a known risk according to his own knowledge and his own admissions. I'm aware that a tree can stand back up, particularly when it gets cut back further. And wouldn't it be reasonable, ask him, for it to be cut back further? Yes, it would. It's his response. So your view is that Mr. Kincaid should have anticipated all of this, anticipated that somebody would come along and cut the tree, anticipated that at that very moment, Mr. Hankins would be standing inside the hole. Well, just to clear up some things, your honor. It's not as if the tree is cut back and then immediately or even shortly thereafter, it falls right down. The way the surrounding circumstances is, first of all, nobody knows the exact timing of it, but it's perceived to be several days. My client and his family were not living at the home at the time. They were separated from their home in temporary housing, coming back periodically. But to answer your question directly, no. It's not my argument that he predicted all of this. And first of all, he doesn't have to. It's my argument that he predicted enough of this. One, not engage the insured in the claims process and put them at a known risk. Or two, at the very least say, I am aware of these possibilities. So if you're going to do this, either one, do it before you remove any more of the tree, or two, wait until that tree is out of there because this really isn't that urgent of a deal. How do you overcome the numerous cases that say insurance adjusters don't owe a duty to the insured? Well, there's also cases that recognize there is a duty, and I've cited those in my brief as well. What is the rationale for that? Well, the rationale for it is the way I perceive most of those cases, not only every one that you're referring to in the abstract, but is that they're not engaged either, one, they're not engaging the insured in the claims process, or two, that particular adjuster was not sent for that purpose. Well, the adjuster here was set for one purpose, to go check the damage from the dropped tree, not to warn of any kind of damages or additional risk that might flow to the homeowner. It's responsibility, doesn't it, flow to the insurer? Not according to Mr. Kincaid's testimony when he says it's my duty to warn them of known hazards. As a moral matter, but as a legal matter, does he have an obligation? He says it's his job responsibility. I understand what he's saying. What is the legal basis to impose a duty on the adjuster to have to warn the insured of hazards on their property? Just as any other premises liability case, when you come to it with a superior knowledge, like, for instance, say this was the homeowner who knew of the danger, or had the capability of knowing the danger, that's really the focus fundamentally in premises liability cases, is who has the superior knowledge? That's where I get into my brief in my oppositions about the four-factor Hopkins test, about the background and training that goes in. These are coming from the superior knowledge of the person who's aware of the risk. Just because you enter somebody's property, depending on what the purpose is for, whether you're a general contractor doing repairs and you come across something or you expose something while the homeowner's at work, if you have superior knowledge of a known risk, you have an obligation under the law to either warn them or at the very least not throw them into the lion's den where the risk is most apparent. Go ahead. Just so I understand, you're saying that Mr. Kincaid had this superior knowledge, being that the tree, if it were cut, the root ball would fall back and he should have anticipated that Mr. Hankins would be in the hole at that moment and he should have warned him of all of that? I'm not just saying that. I'm saying he conceded that. He said, I asked him these questions myself, are you aware of the dynamic that a tree can stand back up? Yes. Was it foreseeable to you that this tree would continue to be cut back? Yes. We also have expert testimony, not just from my expert who says it was dangerous that day, but from the defense expert who describes a tree exactly in the condition of the Hankins tree with cracks and limbs cut off and falling over, that they're unpredictable. There's a springback dynamic. Now, of course, you have to be familiar with this or in the field to really appreciate this, which is the significance here because a homeowner, under the general sense, is not going to have the knowledge that this dynamic could happen, but apparently it does, and it did. And Kincaid himself had superior knowledge of that risk and he decided either not to include that in his explanation or he ignored it. There was another conversation, if I remember correctly, perhaps a neighbor told Mr. Hankins that he should get a pickup truck and get a chain, presumably so they can pull the root ball back into the hole. Instead, he disregarded that and instead went into the hole. That same neighbor also said, we tried to pull this down. This thing won't budge. The other neighbor that was with him at the time said, I got in the hole to figure out what was holding this thing up. This thing wasn't moving, and this is after it was already cut back. So taking the reasonable inferences in the non-movement's favor in that context, that could also reinforce the fact that it was okay to get into that hole under this condition because the professional didn't tell him it was a problem. In fact, the professional encouraged him to do it. And two, my neighbor just said he was in there, said something's holding us up. We tried to get this thing down. It's not going anywhere. Because we're struggling with this idea of what is the duty on the part of a claims adjuster and was that duty discussed? Well, sure. And I would agree with you that the duty aspect of things legally is a little bit more, it's a little bit tougher of a question in the abstract and the proximate cause and superseding cause, at least in my mind. But I still think for the reasons I mentioned in my brief, when you engage somebody, when you voluntarily engage yourself in the service process, within the scope of your employment, you also have to think about when this happened here. This is post-Hurricane Sandy cleanup process. All the literature you read in these claims response textbooks that are agreed to be by all the experts, in this case as authoritative, is you have to understand the fragile nature of the homeowner under catastrophic circumstances. And they're looking at you, the professional adjuster, to advise them how to get themselves back on their feet. You said that the duty should stem from whether the person you want to impose the duty on has superior knowledge. That was your test. If you have superior knowledge, you have duty. What if Mr. Kincaid had no knowledge of the way trees react? If Kincaid had no knowledge of the ways? The way a tree in this position would react. It would be under your test, he wouldn't have a duty because he wasn't well-schooled or experienced enough or hadn't heard of such a thing, or this was his first time referring to a property with an uprooted tree. He would have no duty, but an adjuster who had more knowledge would have a duty. Is that the test we should apply? First of all, applying a different set of facts, you'd have a slightly different analysis. But like the Bruno versus Erie insurance case says, it's the insurance policy that's the vehicle that establishes the relationship under which the tort is committed. We have somebody here who either knew by his own admission or should have known by his own training. If you look at some of the training materials that I attached in my moving papers, you have what is identified as a highly technical aspect when you're dealing with tree removals, catastrophic situations. You also have the fundamental nature or the fundamental position of adjuster who's there to investigate. Kincaid even says, I'm there to do a thorough investigation. To eliminate hazards. Did the materials you just mentioned speak of the risk of rerouting? They speak to the unpredictable nature of downed trees. Kincaid himself recognizes the fact that it can spring back up. The experts recognize that it can spring back up. So this is not a, although maybe to us, and until I Googled it, frankly, after I got this initial fact and could actually see video of this dynamic, I had trouble believing that it could happen under the natural course. However, it's physics. It depends on the balancing. It is, but it also depends on what is the tipping point. That's why it's not material that it was cut back because we don't know when the tipping point took place. There's been no expert analysis on the weight of the tree and at what point the tipping point changed because it certainly didn't, the tipping point certainly didn't change when they were done, the neighbors were done cutting back because they couldn't get it in. So the tipping point didn't change there. Now, if you want to listen to my expert, Mark Weber, and his deposition transcripts in the moving papers as well, that tree was in danger of standing back up when Kincaid was there because, number one, some of the tree limbs had already been cut off, which he saw and took photographs of. He, Kincaid. But two, the very nature of a tree, physics, Your Honor, as you mentioned, the drying out of the naturally dead tree. What dries out first? The roots and the dirt attached to the bottom of the root ball. They tend to dry out first. So arguably, the root side of things is the later end. If it was obvious to Mr. Kincaid when he was standing there, why wasn't it obvious to everyone else who was there? Which part being obvious? I'm sorry. That the tree would be severed and the root ball might collapse back into the hole. Because to the layperson, this is not a dynamic that I think you would reasonably recognize. And, in fact, Eraz, who the defense would like to create into a quasi-expert nature because he cut some trees back as part of his business, he said, I don't know what a normal homeowner would think. There's the rub. I mean, you're saying that he's an expert, but we're saying he's not an expert in that field. I'm not saying he's an expert at all. I'm saying that's what my adversaries are saying. Because he had experience cutting these trees down. I thought you said he. We're talking about two different he's. You're talking about the neighbor that Judge Fuentes is referring to, the adjuster. I apologize. I misunderstood the point from which your question was coming from. Yeah, the adjuster is, and is by definition, a professional with superior knowledge. He even conceded that he had this knowledge. So it's not me arguing you have this knowledge. He's saying. With regard to the dynamics involving the cutting of a tree. If you read the portion of the transcript that I cited, it's specifically referenced in there line by line what my question and answer is to him. And also specifically line by line what my question and answer is to him about the foreseeability of the tree continuing to be cut back. So there's an appellate division case. I think it's called something like Frackelman or something like that. Somebody goes to an adjuster, goes to a house, finds mold after some water damage. Thereafter, the homeowner or someone in the house who has some compromised respiratory condition ends up getting affected by the mold. An argument much like yours was being made, I think, to the appellate division, which was you should have warned that the mold spores could have affected this individual. And the appellate division said, no, we're not going to impose that duty in part because that was not the purpose for which the adjuster came to the premises. The reason why I'm bringing this up is that you're basically asking us to predict that the New Jersey Supreme Court would adopt a position that the adjuster has a duty. But if we have the appellate division as sort of a signal, doesn't that hurt our ability to make that imposition of duty? Not in this case because of the overt nature that Kincaid put himself in by engaging the insured in the claims process. In that case, for example, the adjuster says, why don't you get a scraper and scrape all this mold off just to help clean it up to the homeowner. That may be a different set of circumstances, maybe more analogous here. And I'm not asking for the appellate division or the Supreme Court to suggest in every instance an insurance adjuster responding to an event like this has various duties. What I am suggesting is he had a duty in this case for the reasons I briefed and the reasons we're discussing here. By overtly engaging the insured in the claims process, given the superior knowledge that he had, given what he could anticipate happening. And first of all, remember, when you get to a superseding cause, you have to concede for the sake of the argument that a duty, a breach of that duty, and proximate cause existed before you even address a superseding intervening cause, which are also for the jury unless we're in a highly extraordinary circumstance. But I would suggest, since we're burning back to almost where we started, why don't we get you back on rebuttal because you have five minutes. Thank you. That last point of Mr. Gibson. Oh, I'm sorry. Jennifer Cooper on behalf of Jake Lake and Kate and Crawford and Company. I will have 10 minutes. I'm giving five minutes to Mr. Semple. Thank you, Ms. Cooper. That last point was interesting by Mr. Gibson, I believe it was, that the claims adjuster actually engaged with regard to claims processing. Mr. Hankins, could you discuss that? Engaging in the claims process was the phrase that he used. Correct. Absolutely. That didn't happen in this case. The testimony is undisputed. And I have the citations to the record line opposed to Ms. Hankins. She said that she made the statement, you have to get in that hole. And I later asked her a couple of pages later, how do you know he meant you and not somebody else? She said, I don't know. He could have meant that. Did you ever discuss your conversation with Mr. Kincaid after he left? No. The only time there was ever any discussion about backfilling, getting in the hole, whatever, was when the three of them were there together. So it is her interpretation of what she thinks he meant. And she concedes that he could have meant they needed to hire someone else or a professional, which that's why the insurance company is there, to give them money to hire somebody to do it. And that's all there is. It's not a disputed fact. I mean, it's undisputed that nobody, that he did not necessarily say that. You know that he could have meant somebody else. What about the language that was quoted by Mr. Gibson? Excuse me? What about the language that was quoted from the deposition by Mr. Gibson? On further cross-examination, I said to her, what do you mean by you? What do you mean he said you need to get in that hole? Couldn't he have meant somebody else, like somebody come and do the work? And she said yes. That sounds like that gets sorted out by a jury, doesn't it? I don't think so, because I don't think she's entitled to an inference that he could have meant that it had to be them, because Mr. Kincaid denies it. It's a dispute of material fact as to what was meant by that, that you need to get into the hole and backfill back in. What matters is what Mr. Hankins believed, and she has no idea what he believed it meant. They never discussed it. So how are we today going to have some type of telepathy to find out what Mr. Hankins believed? The only thing we have is we have two witnesses there. We have Mrs. Hankins and we have Mr. Kincaid, right? Correct. And they say different things. Correct, but what matters is what was understood by Mr. Hankins, and we will never know that. So how does that make that you don't get to trial? We don't get to trial because Mr. Araz was the cause of the accident, because it was a superseding event. He came to the property. He offered to cut back the tree. He testified that typically when he did this, and he had done it at least 20 or 30 times, he had specific equipment with him, at least a chain, to pull the root ball back into the hole. He did not have that equipment on the day of the accident. He proceeded anyway. When they finished, his plan for getting it back in the hole was to push it. They attempted to push it. It didn't work. He then told Mr. Hankins, it is unstable, it might fall back in. I warned him that it could fall back in. He then instructed Mr. Hankins to put it back in the hole, and then he left it there for more than a week until the accident happened. But don't we have a circumstance where at least there's some evidence by, I think it's a plaintiff's expert that said the tree was in a dangerous posture when Mr. Kincaid was there? What matters is did Kincaid know if it was in a dangerous posture? He didn't. Your adversary is suggesting that his superior knowledge and his experience and his testimony that trees can uproot is sufficient to infer he knew it was a danger as well. My point in asking this is isn't that an issue of fact? Was it a danger on the day the adjuster was present, or did it become a danger only after it was cut back? And isn't that an issue of fact? It may be, but I don't believe that you need to get to that issue because what was the danger was not the tree standing up. The danger was the root ball falling into the hole. But that's what would happen. The root ball would fall in the hole and the tree stood up. And the tree stands up. I mean, that's how it works. The trunk gets cut off, the root ball falls back down. But the argument, as I understand it, or at least the evidence is it was at risk of engaging in that same physical process both at the time the adjuster was present and as well as the time it was cut, or at least there's an issue of fact. How could it have done that when the adjuster was on? Well, then I think you move on to the issue of duty. And did Mr. Kincaid have a duty to know that? Because he says he did not believe that to be the case. He did not believe it to be dangerous. He crawled over the tree several times himself. And the question of duty is a legal question that does not permit testimony by expert witnesses. Right, okay. So I talked to your adversary about cases that say adjusters have no duty. Well, there are a few cases, not as many, but there are a few that say an adjuster has a duty. Explain how it is a court is to decide when an adjuster has a duty as a matter of law. I do not believe that an adjuster has a duty as a matter of law by virtue of the fact that he is an adjuster or she is an adjuster. The question is when. When they created. What kind of facts would create a duty? I think facts where you do, like in the one case, I believe it was Bruno. They affirmatively told the insured the mold was not dangerous, knowing that they were going to go ahead and do more work. And so analogize it to this case. If there were, if a jury found that affirmatively, Mr. Kincaid told Mr. Hankins to get into the hole and backfill it by hand. Don't you have a problem? I think you still have a superseding cause. I still think that the tree could have been cut back properly. Mr. Kincaid had no reason to believe that it wouldn't be, even if he wasn't going to fire, hire an expert. For the moment that the two neighbors, a Rance and control did didn't do anything. So let's assume just for the moment that there is no superseding cause. Issue. Then could there not be liability under the case you just cited with regard to Mr. Kincaid, saying you need to get down into the hole and backfill by hand? No, because he knew it wasn't. He did not believe it to be a danger. The adjuster Bruno knew that it was, but you just cited me a case saying that in Bruno, somebody said there's not a problem with the mold. In effect is not Mr. Kincaid saying there's not a problem with you getting down into the hole and backfilling it by hand. But I mean, the jury could infer that. I mean, the jury might say, that's just common sense. He didn't get, he gave bad advice. There was no danger until the truck was cut off. Understood. My example is, forget the intervening cause that you believe exists with regard to what Iran's did and what he and control did in terms of cutting back branches later on. If that is not in your case, don't you have a matter that should go to trial as to the, the statement by Kincaid that you should get down into the hole and backfill the hole. It is undisputed that Mr. Kincaid did not know it was a danger. He would have to know it was a danger and was posing a danger to the insured for him to give that instruction. And there is nothing to support that he has or should have any superior knowledge. He is a catastrophe adjuster. Was it, was it in Bruno? Was it undisputed that the person believed that this kind of mold is very bad or didn't know the person meaning the adjuster, your honor, your honor. I have to say, I would have to go back and look at the case to be certain on that issue. But I do want to make one thing very clear. The danger here wasn't just the cutting the trunk from the root ball. The real danger was that a rat left it like it was for at least a week or more by Mr. Catrell's testimony. And the only thing he did to take care of getting it back in the hole. So it wouldn't be dangerous was to instruct Mr. Hankins to get a truck in a chain and to put it back in the hole. And at the end of the day, your honor, nobody knows why he was in the hole. And that is undisputed. And unless you can show that he was in the hole, they say the reason he was in the hole was because he was advised to get down in there and backfill. There is no evidence of that at all. We just, we just talked about the evidence. He was said to get down in the hole and backfill it by hand. Nobody down in there and backfill it by hand. Nobody knows if that's what he was doing. In fact, Ms. Hankins told the homicide detective that he was in there trying to get the root ball back in the hole. Okay. So that would, that would come out at trial. Would it not? Whether you're right or whether you're wrong on those facts would come out at trial. There's no evidence to show that he was in it. It's not that there is evidence. He was in the hole. There's evidence. He was in the hole. There is no evidence in this case as to why he was there. And there is definitely testimony that Mr. Raz told him to get in the hole and told him to get the root ball back in the hole. So the rants didn't tell him to get the whole rants. Supposedly said, you need to get the root ball back, back in the hole. It'll save a lot of, a lot of aggravation. And he told him that it could fall back in. All right. When we hear from your co-counsel. Morning, your honors. I think, I think it's now afternoon. Is that we just passed David sample from the law office of McCormick and Priori representing defendant, a Peli Philadelphia contribution ship insurance company. Your honors for the sake of brevity and my four minutes and 41 seconds remaining on the clock. PCIC will adopt the arguments made in the briefing and in the argument by Ms. Cooper in regard to the proximate cause issue, as well as the duty issue. There are, however, several other issues that are not applicable to PCIC as the other issues are. Again, in regard to approximate cause and the district court noted that the defendants in that matter needed a like analysis in regard to the proximate cause issues. Again, the duty, the same thing, the cases that your honors have discussed with Ms. Cooper, Mr. Gibson address, both insurance carriers and insurance adjusters. So we would submit that it's the same analysis required. So in looking at the claims against PCIC, the fact of the matter is that there's really no independent claims that PCIC did anything wrong. In essence, all we have here is a claim that PCIC should be vicariously liable for any acts, errors or omissions of Mr. Kincaid and Crawford. And why shouldn't that be the case? Assuming we find that there was a duty where Crawford had that PCIC delegated to Crawford settlement of claims, $25,000 or less, i.e. acting like it's agent. So why shouldn't, if they, he has a duty, PCIC is, could be vicariously liable. Your honor, because Crawford and Kincaid were the independent contractor of PCIC and pursuant to New Jersey case law, longstanding principle that an independent contract can only be, sorry, principle can only be held liable for the negligent acts or omissions of its independent contractor under three separate circumstances. That being one, if the principle controlled the means and methods of the activity by the independent contractor to the independent contractor was incompetent or three, the activity itself was a nuisance per se. Okay. Now in this matter, none of these qualify. There's actually no argument made that Mr. Kincaid or Crawford were incompetent. There's no argument that has been made that the activity was a nuisance per se. The only argument is that there was some control by PCIC over the actions of Mr. Kincaid. And in that regard, Ms. Hankins argues essentially that one snippet out of the service agreement between PCIC and Crawford required that the work be performed in a diligent or workmanlike manner. However, that certainly is not exercising control. And actually the case law, Marion versus PSE and G by the New Jersey appellate division, which was cited with approval by Jarrah versus Trump hotels by the United States district court of New Jersey stated clearly that solely supervisory control in essence is to make sure that the activity will be done and done properly is not enough to rise to the level of control, which will then allow liability to be found against the principal for the acts of the negligent contractor. Does the fact that there's this $25,000 or less authority granted to Crawford support your view that while they're your agent, we don't control them because we've jettisoned claims of that level or less. I think it does support my view, your honor. And actually the fact shows they're an agent, but we don't control them. There was no control. Mr. Kincaid was out there on the premises by himself. He didn't have someone looking over shoulder. This wasn't a construction site where there's a foreman who's directing people where to go. He's out there by himself. He's out there. He's taking a look. Okay, here's the damage. What's covered. What's not covered. He writes it up. He submits an estimate to PCIC and says, okay, here's what I think you need to pack. That's not control. Now, the interesting thing in that regard to your honor is the fact that a plaintiff's expert, Mr. EODs actually stated basically they gave everything to Crawford and company and just said, handle it. But now Ms. Hankins played a sitting here saying that PCIC controlled the means and methods, but you can't have it both ways. There was no control. They were an independent contractor and none of the exceptions as detailed in the numerous cases, including majestic, et cetera, have been satisfied in this regard. I did also just want to briefly mention that plaintiff argued in her brief that PCIC should be considered a general employer and there should be held responsible. But with all due respect, I don't think it's addressed. It doesn't apply to this matter. And also there's, the argument was made that there's some apparent authority here. However, again, the, the case law on apparent authority is not sufficient to bring PCIC as principal to be liable for the acts, errors or emissions here, because again, you're, as your honor noted, this was a claim. Crawford had the independent actually a $25,000 authority. However, the, what must be noted here is that the cases which discuss apparent authority require basically that a third party was misled in this case from the very beginning. As soon as Mr. Crawford called Ms. Hankins to set up the appointment to come, he specifically said, I'm from Crawford before he ever stepped foot on the property. That's covered in your brief as well. That's right. Thank you. Thank you very much. Mr. Gibson. I, I know we, you asked for five minutes. We bought it. We gave you instead of 10 minutes. So I think we gave you close to 20 the first time up. So why don't we just limit it to two minutes if that's okay with you? That's fine. And really by design in the event that some of these other issues like agency and duty came up, that's why I wanted to give myself that additional time. I didn't think it was actually necessary, although I'm happy you three of you engaged me the way that you did. Initially. I'd like to try and kind of take this in reverse since we just heard about the agency arguments. First of all, there was control. It doesn't necessarily have to be on site next to you control, but there was control from Crawford or from PCIC by way of the serve client service agreement by the orientation meeting pre hurricane Sandy before any of the adjusters actually went out to property.  according to the designated corporate representative from Crawford, Larry Smith, he said primarily what we did is at the direction of the client who was PCIC that's at, this is at my second appendix 004 page 13 lines nine through 10. Also, I know we didn't get into this much, but I think it's worth noting under the agency theory is the reliance aspect  and the reliance that they have is that this is all being done on the part of their homeowner. They're not aware of any independent contractors. This is all stemming from the direction of their homeowners carrier. That's who there's connection with. So there is sufficient control. There is sufficient direction to either keep PCIC in under a direct control theory or an apparent authority theory from my standpoint. That being said, given the limited time, I'd like to address a couple of things that council said. And if, if your honors have any additional things in 17 seconds, is this, are you familiar with the dynamic that a tree that is cut back that are still connected to the root ball can stand up answer? Yes. Isn't it reasonable to foresee that the tree is going to eventually be cut back? Yes. Is it your duty to foresee and warn hazards up to the homeowner during the inspection? Answer is yes. Do you recall any warning? I do not recall any warning. This adjuster took it upon himself under the, within the scope of his employment, under the guise of a professional aiding a homeowner in a time of loss to engage in short in a known risk that he reasonably anticipated. He may not have had to predict the result. He didn't get in the home. Lightning didn't strike him. This tree stood up. You just stated your theme and that's the theme throughout. Thank you. Got it. Thank you. It's actually well done for everyone and appreciate it. We'll take the matter under advisement and.